**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| e-LYNXX CORPORATION, | : | CIVIL ACTION NO. 1:10-CV-2535 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Conner) |
| v. | : | |
| | : | |
| INNERWORKINGS, INC., | : | |
| RENT-A-CENTER, INC., | : | |
| DR. PEPPER SNAPPLE GROUP, | : | |
| INC., R.R. DONNELLEY & SONS | : | |
| CO., NEWLINENOOSH, INC., | : | |
| THE STANDARD REGISTER CO., | : | |
| AND CIRQIT.COM, INC., | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM

Presently before the court in the above-captioned matter are two motions for

summary judgment on the grounds of non-infringement (Docs. 232, 235), filed by

defendants Cirqit.com, Inc., and InnerWorkings, Inc., respectively. Also before the

court is the motion for leave to file an amended answer (Doc. 252), filed jointly by

defendants, and plaintiff e-LYNXX Corporation's motion to strike Cirqit's summary

judgment evidence (Doc. 259). The motions have been fully briefed and are ripe for

disposition. For the reasons to be discussed, the court will deny e-LYNXX's motion

to strike and defendants' motion to amend, and grant InnerWorkings' and Cirqit's

motions for summary judgment.

I. **Procedural History**

e-LYNXX originally filed this action in the United States District Court for

the Eastern District of Texas, in August 2010. e-LYNXX voluntarily dismissed that

case, refiling in this district on December 14, 2010. (See Doc. 1). The parties filed

their Joint Case Management Plan (Doc. 7) on March 22, 2011, setting the deadline

for amending pleadings as May 1, 2012. Trial in this matter is currently scheduled

for November 2013.

In August and September, 2011, the parties filed briefs regarding their

respective claim constructions, and defendants moved for summary judgment on

grounds of patent invalidity. On October 11 and 12, 2011, the court heard oral

argument on summary judgment and held a claim construction hearing, pursuant

to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996). The court issued a

memorandum and order denying the motion for summary judgment and construing

the disputed claim terms on September 27, 2012. While those motions were

pending, e-LYNXX moved for leave to file a second amended complaint, in order to

assert claims of infringement of a newly issued patent, number 8,209,227 ("the '227

patent"). In their joint brief in opposition to e-LYNXX's motion, defendants argued

that prejudice would result from amendment because they had engaged in

"significant discovery," including document production, written discovery, and the

issuance of subpoenas to third parties regarding prior art. (Doc. 204 at 6). The

court denied the motion to amend on October 31, 2012, concluding that amendment

would "delay resolution of this matter, whether by trial or dispositive motion, at

least several months." (Doc. 214 at 6). On February 1, 2013, the parties submitted a

joint motion to extend the deadline for filing dispositive motions to February 18,

2013, which the court granted. Cirqit and InnerWorkings separately moved for

summary judgment on February 19, 2013, but did not file their joint motion for leave to amend until March 18, 2013.

## II.  **The Invention and Claims**

e-LYNXX alleges that Cirqit and InnerWorkings infringed U.S. Patent No. 7,451,106 (the "'106 patent") and U.S. Patent No. 7,788,143 (the "'143 patent"). Both patents cover procurement systems for competitive bidding on customized goods and services. They share the same specification, which describes the invention as "[a]n apparatus and method for selecting a lowest bidding vendor from a plurality of vendors of a customized good or service." '106 patent, abstract; '143 patent, abstract. The invention seeks to streamline the process for procuring customized goods or services by reducing the search costs for buyers. As described in the specification, the prior art in this area generally limited buyers to soliciting bids from a small number of vendors, awarding the contract to the lowest bidder or to a bidder with whom the buyer had a previous relationship, and could therefore trust to produce high quality work. See '106 patent, col. 2, ll. 4-11. Buyers could attempt to "shop" the lowest bid to other vendors in an effort to secure a better deal, but to do so was both expensive and time consuming, and prevented buyers from securing the benefits of competition between many bidders.

Nor were suppliers without their inefficiencies. Manufacturers in industries with substantial overhead and labor costs, such as printing and information product suppliers, see id. col. 2, ll. 35-50, must balance their need to maintain a steady production schedule with the need to be available on short-notice to handle

3

rush orders from regular customers. Manufacturers do not want to allow their machinery to sit idle for too long, cutting into their profit margins. Accordingly, they build into their production schedules a certain amount of slack time in the event that a customer places an unexpected rush order. Id. But if an expected order is cancelled, a manufacturer may be left with both an unscheduled lapse in its regular production schedule, and planned downtime that it has yet to fill with a rush order. Vendors seek to fill these unexpected holes in their production schedules with short-turnaround orders, which they secure by undercutting competitive bids. Id. col. 2, ll. 50-56. This process is referred to as "contribution pricing," because the price is below the manufacturer's normal profit margin level, but it nevertheless "contributes" to the bottom line more so than would idle machinery and labor.

In the instant matter, e-LYNXX accuses defendants of infringing claims 13-16 and 18 of the '106 patent, and claims 1 and 2 of the '143 patent. Claim 13 of the '106 patent states the following:

> A system for facilitating a buyer's selection of a vendor via automated comparison of records and based upon bidding by vendors of customized goods or services via a computer operated system, comprising:
> a means for receiving electronic communications from a plurality of vendors prior to receiving job data from a buyer pertaining to a job for which the buyer seeks a vendor, the electronic communications being used in establishing a plurality of vendor records which are stored in an electronic memory associated with the computer system, the vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service;

a means for receiving an electronic communication from any buyer using the system providing information identifying a plurality of vendors for inclusion in a pool of vendors associated with said buyer to potentially receive a job solicitation, wherein the system stores electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the buyer transmitted vendor pool identification information which occurs prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

a means for receiving an electronic communication defining a job data from or on behalf of at least one buyer, after said buyer's vendor pool is determined, said job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which said buyer wishes a bid;

a means for automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the pool of vendors associated with said buyer;

a means for automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

a means for transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

a means for receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying each of the vendors from which it was received and a bid price;

and a means for outputting to said buyer an electronic communication providing at least one of said bid response data.

Claim 1 of the '143 patent states:

A method for facilitating a buyer's selection of a vendor via automated comparison of records and bidding by vendors for customized goods or services via a computer operated system, comprising the steps of:

prior to processing job data from a buyer pertaining to a job for which the buyer seeks a vendor, receiving and processing electronic communications from a plurality of vendors, the electronic communications being used in establishing a plurality of vendor records which are stored in an electronic memory associated with the

computer system, the vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service;

receiving an electronic communication from or on behalf of any buyer using the system which provides information identifying a plurality of vendors for inclusion in a pool of vendors associated with the buyer to potentially receive a job solicitation, and storing electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the received electronic communications from the buyers providing vendor pool identification information, the vendor pool identification information being processed prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

receiving an electronic communication defining a job data from or on behalf of at least one buyer after the buyer's vendor pool is determined, the job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which the buyer wishes a bid;

automatically comparing via a computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the vendor pool of vendors associated with the buyer;

automatically identifying via a computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

thereafter transmitting the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

receiving bid response data from at least one of said vendors which received said solicitation, said bid response data identifying a bid price for the corresponding vendor;

and outputting to said buyer an electronic communication providing at least one of said bid response data.

Claim 2 of the '143 patent states:

A computer operated system for facilitating a buyer's selection of a vendor via automated comparison of records and bidding by vendors for customized goods or services, the system comprising:

an electronic memory comprising a plurality of vendor records corresponding to each of a plurality of vendors and having vendor capability data identifying a plurality of capabilities for said vendor to

provide a customized good or service; and

a computer processor associated with said electronic memory, the computer processor configured to:

receive and process electronic communications from a plurality of vendors, prior to processing job data from a buyer pertaining to a job for which the buyer seeks a vendor, the electronic communications being used in establishing the plurality of vendor records which are stored in the electronic memory;

receive an electronic communication from or on behalf of any buyer using the system which provides information identifying a plurality of vendors for inclusion in a pool of vendors associated with the buyer to potentially receive a job solicitation, and storing electronic data sufficient to identify every vendor pool and its association with a corresponding buyer based upon the received electronic communications from the buyers providing vendor pool identification information, the vendor pool identification information being processed prior to analysis of job data pertaining to a job for which bids are sought by or on behalf of the buyer;

receive an electronic communication defining a job data from or on behalf of at least one buyer after the buyer's vendor pool is determined, the job data including a job descriptor data which specifies a plurality of characteristics of said customized good or service for which the buyer wishes a bid;

automatically compare via the computer processor said vendor records to said job data, wherein said comparing includes comparing said plurality of characteristics for said customized good or service with corresponding plural capabilities for vendors from the vendor pool of vendors associated with the buyer;

automatically identify via the computer processor at least one subset from the buyer's associated pool of vendors as qualified for receiving the solicitation, based on said comparison;

thereafter transmit the solicitation to only selected members from the identified subset of the buyer's associated pool of vendors;

receive bid response data from at least one of said vendors which received said solicitation, said bid response data identifying a bid price for the corresponding vendor; and

output to said buyer an electronic communication providing at least one of said bid response data.

Claims 14, 15, 16, and 18 of the '106 patent are dependent claims that refer back to

independent claim 13.

III.    **The Accused Products**

A.    **InnerWorkings**

InnerWorkings is in the business of providing global print management and promotional products to corporate clients in a variety of industries. InnerWorkings procures, manages, and delivers print materials for their clients through a system known as Print Procurement Manager 4 ("PPM4"). InnerWorkings claims that the PPM4 system contains approximately 9,000 suppliers of print products.

The PPM4 system's precise operating details will be discussed at length *infra*, but generally speaking, InnerWorkings employs print procurement managers to manage the procurement process for its clients. InnerWorkings' clients do not have direct access to the PPM4 system; rather, clients communicate the specifications of their proposed jobs to managers, who in turn input this information into the system. The managers are neither assigned nor grouped with specific vendors, nor does the buyer determine which vendors against whom a particular set of job data will be compared. Indeed, though nominally disputed by e-LYNXX, the PPM4 system does not have the capability to extract subsets of vendors to compare with job data; rather, the system compares job data against the entire database of vendors in order to identify the best vendor for the particular job at hand.

B.    **Cirqit**

Cirqit is a Delaware corporation in the business of e-Procurement software. Order-It was developed at Cirqit by vice president of product management Dan

Miller, who then left Cirqit to work for former-defendant R.R. Donnelly. In October 2009, Cirqit was sold to LogicSource.

Cirqit developed and sold the accused Order-It system, which allows buyers to submit to vendors invitations to bid on contracts for customized paper goods. The Order-It system is intended to provide an efficient and cost-effective means to source customized paper goods, such as letterhead and envelopes. It is a web-based system that allows a buyer to compare potential vendors with the specifications of the particular job, and then select one to provide the requested goods. Unlike PPM4, buyers have direct access to the Order-It system, and they are able to describe the vendors they are interested in soliciting. The parties disagree over the significance of this fact, as well as what information Order-It stores, and what information it uses to evaluate which vendors from whom to solicit bids. Both will be discussed at length *infra*.

## IV.    Discussion

The arguments presented by Cirqit and InnerWorkings on summary judgment are unique to each defendant, and the court will address them separately. First, however, the court will address defendants' motion for leave to file an amended answer, and e-LYNXX's motion to strike evidence presented by Cirqit in support of its motion for summary judgment. Both of these motions will be denied.

### A.    Defendants' Motion for Leave to File an Amended Answer

Defendants seek leave to file an amended answer to add an affirmative defense and counterclaim of inequitable conduct. e-LYNXX stridently opposes this

motion, arguing that defendants were tardy in seeking leave to amend and that their purpose is to delay, that prejudice would result from amendment, and that amendment would be futile.  The court agrees with e-LYNXX, and will deny the motion.

A motion to amend a pleading in a patent case is governed by regional circuit law.  Advanced Software Design Corp. v. Fiserv, Inc., 641 F.3d 1368, 1380 (Fed. Cir. 2011).  The Federal Rules of Civil Procedure allow a party to amend a pleading once as a matter of course, within 21 days after serving it, or within 21 days after the filing of a responsive pleading or service of a motion under Rule 12(b), (e), or (f).  FED. R. CIV. P. 15(a)(1).  In any other circumstance, a party seeking to amend must obtain written consent of the opposing party, or seek leave of court, which should be given freely "when justice so requires."  FED. R. CIV. P. 15(a)(2).  The decision whether to grant a motion for leave to amend is committed to the sound discretion of the district court.  See Lorenz v. CSX Corp., 1 F.3d 1406, 1413 (3d Cir. 1993) (citing Bechtel v. Robinson, 886 F.2d 644, 647 (3d Cir. 1989)).  The "touchstone for the denial of an amendment" is prejudice to the non-moving party, Lorenz, 1 F.3d at 1413-14, but leave may be denied for a variety of reasons – for example, if the plaintiff's conduct exhibits "undue delay, bad faith or dilatory motive."  Foman v. Davis, 371 U.S. 178, 182 (1962).  A significant and undue delay in moving to amend may itself be prejudicial enough to justify denial.  CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 629 (3d Cir. 2013).

Defendants' theory of inequitable conduct derives from e-LYNXX's alleged

failure to disclose a prior art procurement system while prosecuting the patents-in-suit before the PTO. They argue that e-LYNXX operated two procurement systems before applying for the instant patents – called ABC BidsPlus and CAPS – but disclosed only ABC BidsPlus to the PTO. Defendants deposed e-LYNXX's Chief Technology Officer Kevin Long, General Counsel Andy Hawks, and named inventor William Gindelsperger on November 6, 7, and 8, 2012, respectively. They allege that, during Mr. Long's deposition, they "learned more detailed information" regarding e-LYNXX's prior art, specifically that Mr. Long "confirmed" the existence of ABC BidsPlus and CAPS, "confirmed" that the systems were different, and indicated that CAPS performed "most, if not all" of the steps in the instant patents. (Doc. 252 at 3). Defendants further allege that, while deposing Mr. Hawks, they learned that he was involved in prosecuting the patent applications, was aware of both ABC BidsPlus and CAPS, and that he discussed both systems with the prosecuting attorney Mr. Robert J. Depke. Mr. Hawks allegedly chose to "selectively" disclose to the PTO only information about ABC BidsPlus. (Id. at 3-4). This deposition, defendants claim, led them to subpoena Mr. Depke, whom they deposed on January 18, 2013. According to defendants, Mr. Depke was aware of both ABC BidsPlus and CAPS, and chose to withhold information regarding CAPS from the PTO. (Id. at 4). Defendants assert that e-LYNXX's failure to disclose the CAPS system to the PTO renders the patents unenforceable.

e-LYNXX vigorously disputes the merits of defendants' inequitable conduct claim, but argues first that the motion is untimely. e-LYNXX directs the court's

attention to a set of documents it produced to defendants on October 14, 2011. (See Nicholson Letter, Br. in Opp. Ex. B, Doc. 274-1 at 15-16). These documents were labeled with bates numbers ELC00001 through ELC044598. (Id.) Included within this production is a document entitled "BidsPlus® CAPS™ Participation Agreement" and subtitled "BidsPlus Contracted Agent Procurement Service," which bears bates numbers ELC042396 through ELC042429. (CAPS Agreement, Br. in Opp. Ex. C, Doc. 274-1 at 19). Defendants rely heavily – according to e-LYNXX, exclusively – on the CAPS agreement to support their claim of inequitable conduct.

Defendants argue that their motion is timely in light of the heightened pleading standard for claims of inequitable conduct imposed by Federal Rule of Civil Procedure 9(a). See Cent. Admixture Pharmacy Serv., Inc. v. Advanced Cardiac Solutions, P.C., 482 F.3d 1347, 1356 (Fed. Cir. 2007). Although regional circuit law governs motions to amend pleadings in patent cases, Federal Circuit law applies to the question of whether the pleading meets the standard of Rule 9(a). Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1326 (Fed. Cir. 2009). Inequitable conduct must be plead with "particularity," setting forth the "who, what, when, where, and how" of the material misrepresentation or omission before the PTO. Id. at 1327 (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).

Defendants' position is that despite the early disclosure of the CAPS agreement, it was not until after the depositions of Messrs. Gindlesperger, Hawks,

12

and Depke that they had enough information to plead inequitable conduct.  Hawks and Gindlesperger were deposed in early November 2012, and Depke on January 18, 2013.  However, as e-LYNXX correctly notes, defendants have been in possession of the CAPS agreement since October 24, 2011, at which point it would have been clear that the agreement was not disclosed in the file wrappers for the '106 and '143 patents.  Defendants excuse their delay in deposing Gindlesperger, Hawks, and Depke by arguing that the parties waited until after the court's Markman ruling to conduct the bulk of their discovery, but this assertion is diametrically opposed to the position that defendants took in their brief in opposition to e-LYNXX's motion for leave to file an amended complaint.  There, defendants argued against amendment because "the parties ha[d] conducted significant discovery related to the '106 and '143 patents," and that allowing e-LYNXX to add a claim for infringement of a new patent would necessitate "new discovery."  (Doc. 204 at 4, 9).  Nothing stopped defendants from conducting discovery on the CAPS agreement shortly after that document was produced.  See Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd., 599 F.3d 1308, 1320 (Fed. Cir. 2010) (affirming denial of a motion to amend an answer because "[n]othing prevented" the defendant from conducting discovery on its inequitable conduct defense at an earlier time).  Further, even if the parties agreed to postpone discovery until after the court's Markman order, that agreement does not excuse defendants' delay in seeking leave to amend until nearly a month after the deadline for dispositive motions.

At this late stage in litigation, it is a virtual certainty that granting defendants' motion would result in prejudice to e-LYNXX. To do so would moot the pending motions for summary judgment, and would likely require the court to extend the upcoming trial date. Considering the duration of this litigation and defendants' idleness in seeking leave to amend, the court is unwilling to delay resolution of this matter any further. Accordingly, defendants motion for leave to file an amended answer will be denied.

**B.    e-LYNXX's Motion to Strike**

e-LYNXX has moved to strike the declaration of Craig Garno, current managing director for OneMarket Operations for LogicSource, Inc., and former General Manager and Vice President for Technology for Cirqit, which Cirqit provided in support of its motion for summary judgment. Mr. Garno is one of the individuals who developed Cirqit's allegedly infringing Order-It software system, and he provides in his declaration information regarding who can access the system, what type of information can be submitted, and by whom. e-LYNXX asserts that Cirqit should not be permitted to rely on this declaration because it failed to disclose Mr. Garno in its Rule 26 disclosure or as a Rule 30(b)(6) witness, and did not produce such a witness for deposition on the functionality of the Order-It system.

e-LYNXX's argument blurs the lines between two distinct federal rules. Rule 26(a) requires a party, without awaiting a discovery request, to disclose the identity and contact information of individuals likely to have discoverable

14

information that the disclosing party may use to support its case, unless the witness would be presented solely for impeachment. FED. R. CIV. P. 26(a)(1)(A)(i). Rule 26(e) imposes a continuing obligation on a party to supplement its Rule 26(a) disclosures "in a timely manner" if it learns additional or corrective information through the discovery process, unless that information has been made known to the other parties through discovery or in writing. FED. R. CIV. P. 26(e)(1). Rule 30(b)(6), on the other hand, allows a party to name as a deponent an organization, which must then designate one or more "officers, directors, or managing agents, or designate other persons" to testify on the organization's behalf. FED. R. CIV. P. 30(b)(6).

e-LYNXX can find no recourse in Rule 26. Although it appears that Cirqit did not disclose Mr. Garno as a potential fact witness in its initial Rule 26(a) disclosures, made in March 2012 (see Doc. 270 at 2), Cirqit did apprise e-LYNXX of Mr. Garno and his familiarity with the functionality of the accused systems on a number of occasions throughout discovery. On November 24, 2012, in response to e-LYNXX's first set of interrogatories, which were filed on October 22, 2012, Cirqit identified Mr. Garno and Hany Teylouni, both of LogicSource, as fact witnesses familiar with the Order-It system. (See Cirqit Interrogatory Answers, Doc. 270-4 at 5). On December 3, 2012, the parties filed a joint motion for extension of the fact discovery deadline, which the court granted that same day, extending the deadline for discovery until January 18, 2013. e-LYNXX's overwrought complaint that Cirqit did not identify Mr. Garno in its Rule 26 disclosures is true but irrelevant: he was

elsewhere identified *at least* in interrogatory responses and, according to Cirqit, during the deposition of its Rule 30(b)(6) designee.  See FED. R. CIV. P. 26(e)(1), (2). Despite its awareness of Mr. Garno and the extended discovery timetable, e-LYNXX did not seek his deposition.

Similarly, Cirqit complied with Rule 30(b)(6), and e-LYNXX's failure to depose Mr. Garno can be attributed only to its own lack of diligence.  Rule 30(b)(6) requires a subpoenaed organization to designate a corporate officer or other person to testify on its behalf.  e-LYNXX served its notice of deposition on November 16, 2012, in response to which Cirqit made available for deposition Mr. John Wehrle, chairman of the board of directors.  Cirqit informed e-LYNXX that it would be unable to produce a Rule 30(b)(6) witness with technical knowledge of the Order-It system, as it no longer employed such an individual.  At no time during the course of discovery, nor before the filing of dispositive motions, did e-LYNXX seek to compel Cirqit to produce a Rule 30(b)(6) witness with technical knowledge of its systems, nor did e-LYNXX specifically seek Mr. Garno's deposition.  Whether or not such a motion, timely filed, would have been successful is beside the point.  e-LYNXX failed to pursue the matter prior to Cirqit's summary judgment motion, and the court will not punish Cirqit now.  See Gutierrez v. AT&T Broadband, LLC, 382 F.3d 725, 733 (7th Cir. 2004).  Accordingly, e-LYNXX's motion to strike will be denied.

## C. Summary Judgment

Cirqit and InnerWorkings have separately moved for summary judgment, each arguing that there is no genuine dispute of material fact that their accused products do not infringe e-LYNXX's patents as the court has construed the patent claims. For the reasons to be discussed, the court agrees.

### i. Summary Judgment Standard

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(a). The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(a). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

Pursuant to 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell or sells any patented invention" during the life of the patent, commits patent infringement. The larger question of infringement can be distilled to two discrete issues: what is the thing that was patented, and has the accused infringer

17

made that thing?  See ROBERT L. HARMON, ET AL., PATENTS AND THE FEDERAL

CIRCUIT 463 (10th ed. 2011).  Determining what the patent covers is a question of

law that the court answers through claim construction; infringement – whether

literal or through the doctrine of equivalents – is a factual question.  Ultra-Tex

Surfaces, Inc. v. Hill Bros. Chemical Co., 204 F.3d 1360, 1363 (Fed. Cir. 2000).

To be liable for direct infringement of a method claim, an alleged infringer

"must perform all the steps of the claimed method, either personally or through

another acting under his direction or control."  Akamai Tech., Inc. v. Limelight

Networks, Inc., 692 F.3d 1301, 1307 (Fed. Cir. 2012).  The plaintiff must prove by a

preponderance of the evidence that the accused device "contains each limitation of

the asserted claim(s)."  Bayer AG v. Elan Pharm. Research Corp., 212 F.3d 1241,

1247-48 (2000).  There is no literal infringement, as a matter of law, "[i]f any claim

limitation is missing from the accused device."  Id.; see also HARMON, ET AL., at 467-

68 (noting that the Federal Circuit has adopted the "All Limitations Rule," meaning

that to establish infringement, "every limitation set forth in a claim must be found

in an accused product or process exactly or by a substantial equivalent").

If one or more claims do not read literally on the accused product or process,

it may still infringe if its elements are equivalent to the claimed elements of the

patented invention.  Mirror Worlds, LLC v. Apple Inc., 692 F.3d 1351, 1357 (Fed. Cir.

2012) (quoting Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21

(1997)).  Under the doctrine of equivalents ("DOE"), infringement exists if the

differences between a claim limitation and the corresponding element in the

18

accused product or process are "insubstantial." <u>Voda v. Cordis Corp.</u>, 536 F.3d 1311, 1326 (Fed. Cir. 2008). Put another way, an element in the accused product is equivalent to a claim limitation if it "performs substantially the same function in substantially the same way to obtain substantially the same result." <u>Id.</u>

e-LYNXX alleges infringement of independent claim 13 and dependent claims 14, 15, 16, and 18 of the '106 patent, and independent claims 1 and 2 of the '143 patent. "An independent claim is completely self-contained. A dependent claim refers back to an earlier claim and is considered to include all of its own limitations as well as those of the referenced claim." HERBERT F. SCHWARTZ AND ROBERT J. GOLDMAN, PATENT LAW AND PRACTICE § 2.III.B.1 (7th ed. 2011). To infringe a dependent claim, one must necessarily infringe the independent claim to which it refers. <u>Wahpeton Canvas Co., Inc. v. Frontier, Inc.</u>, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).

ii.   <u>InnerWorkings' Motion for Summary Judgment</u>

InnerWorkings bases its motion for summary judgment on the court's construction of the claim term "buyer." At the claim construction stage of this litigation, e-LYNXX argued that "buyer" means simply "one who makes a purchase." (Doc. 205 at 9). The court rejected this construction, instead adopting defendants' proposal and construing "buyer" to mean "the ultimate purchaser of customized goods or services." (<u>Id.</u> at 9-11). The court also construed the term "a pool of vendors associated with said buyer" to mean "two or more vendors associated with a buyer that can potentially receive a job solicitation from that

19

buyer." (Id. at 33).

InnerWorkings is in the business of procuring, managing, and delivering printed materials for corporate clients across a variety of industries. According to InnerWorkings, PPM4 does not practice three elements of e-LYNXX's patents: first, the buyer never has access to PPM4 to procure bid jobs; second, PPM4 does not associate a pool of vendors with the buyer; and third, a supplier's bid response data is not output to the buyer. Because the court finds InnerWorkings first and second arguments to be dispositive, it is unnecessary to address the third.

        *a.*     *"Buyer"*

It is undisputed that InnerWorkings' clients do not directly access the PPM4 system. (See Doc. 237-2 at 8; Doc. 266 at 6). Instead, InnerWorkings employs print "managers" to interact with the PPM4 system, who determine which suppliers receive bid solicitations. (See Cioffi Dep., Doc. 237-12 at 144:4-9; 152:16-20). InnerWorkings argues that because the buyer, defined by the court as the ultimate purchaser of the goods, does not interact with PPM4, it cannot be liable for infringement.

With respect to the '143 patent, this argument is rejected. InnerWorkings' argument fails to appreciate the language that accompanies buyer in the '143 patent's claims. Claim 1 describes the receipt of "an electronic communication from *or on behalf* of any buyer" defining the buyer's job data. '143 patent, col. 19, ll. 13-14 (emphasis added). Further, it claims "an electronic communication *from or on behalf of* any buyer" providing information identifying vendors. Id. col. 19, ll. 1-2

20

(emphasis added). Claim 2 claims a computer system that "receive[s] an electronic communication defining a job data *from or on behalf of* at least one buyer." Id. col. 20, ll. 21-22 (emphasis added). Although, as the court recognized in its claim construction order, the definition of buyer is narrower than simply "one who makes a purchase," the '143 claims are not so circumscribed. See also id. col. 20, ll. 9-10 (claiming a system that "receive[s] an electronic communication *from or on behalf of any buyer using the system*" that identifies vendors for the vendor pool) (emphasis added). InnerWorkings' print managers input job specifications into the PPM4 system on behalf of their clients, the buyers and ultimate purchasers. The '143 patent does not require that the buyer directly input data into the system, as claims 1 and 2 make clear. Therefore, summary judgment on infringement of the '143 patent is inappropriate on these grounds.

The '106 patent is, however, a different matter. Claim 13 provides that information identifying the vendors in the buyer's vendor pool be communicated through an electronic communication "from any buyer using the system." '106 patent, col. 21, ll. 11-12. As e-LYNXX concedes, claim 13 lacks the "on behalf of" language present in the '143 patent claims. (Doc. 266 at 14). Acknowledging this distinction, e-LYNXX appeals to the court's construction of the term "electronic communication" to suggest that the claim does not require direct interaction with the system by the ultimate purchaser, but this argument fails. In its claim construction order, the court rejected defendants' argument that "electronic communication" meant strictly "electronic data input/output directly to/from the

21

system" by the named actor, i.e., the buyer. (Doc. 205 at 11-12). The court

concluded that to construe "electronic communication" in such a manner would

read out of the claims the "from or on behalf" language. (Id. at 13). In other words,

the court rejected the argument that the *term itself* required input by the ultimate

purchaser. Instead, the court construed "electronic communication" to mean

simply "information transmitted or conveyed electronically." However, the court

did not hold that the sender of the electronic communication could not be limited

by the surrounding language of a particular claim. That is precisely what claim 13

does, claiming "a means for receiving an electronic communication *from any buyer*

*using the system*." '106 patent, col. 21, ll. 11-12 (emphasis added). Claim 13 therefore

imposes a limitation on who may send the electronic communication that does not

read literally on the PPM4 system.[1]

    As an alternative to literal infringement, e-LYNXX argues that

InnerWorkings' PPM4 system infringes claim 13 of the '106 patent under the

---

[1] The court similarly rejects e-LYNXX's "system" argument. Claim 2 of the '143 patent and claim 13 of the '106 patent are both "system" claims. e-LYNXX asserts that even if the claims require direct access to the system by the buyer, InnerWorkings can still be liable for infringement because it "uses" the system. To be liable for direct use infringement, "a party must put the invention into service, i.e., control the system as a whole and benefit from it." Centillion Data Sys., LLC v. Qwest Communs. Int'l, 631 F.3d 1279, 1284 (Fed. Cir. 2011). According to this theory, InnerWorkings maintains control over the PPM4 system, and therefore can be liable for infringement even if some elements of the claims are performed by another party. This argument fails because every element of the claim must still read on the accused system, regardless of whether physical or direct control over each element resides in a single party. Id. Here, a required element of the claim is that the electronic communication originate *from the buyer*. That is simply not the case in the PPM4 system.

doctrine of equivalents.[2] A product that does not literally infringe one or more of a patent's claims may still infringe if elements of the accused product are equivalent to claimed elements in the patent. Mirror Worlds, LLC v. Apple Inc., 692 F.3d 1351, 1357 (Fed. Cir. 2012). Infringement under the DOE may be found when the differences between the limitations in the claim and the allegedly infringing element of the accused device are "insubstantial," Voda v. Cordis Corp., 536 F.3d 1311, 1327 (Fed. Cir. 2008), or, in other words, when the accused device "performs substantially the same function in substantially the same way to obtain substantially the same result." Mirror Worlds, 692 F.3d at 1357 (quoting Voda, 536 F.3d at 1326). This latter formulation is known as the "function-way-result" test. Under either rubric, "the doctrine of equivalents must be applied to individual limitations of the claim, not to the invention as a whole." Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co., 520 U.S. 17, 29 (1997). The All-Elements Rule is equally applicable to infringement under the DOE as it is to literal infringement, TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc., 529 F.3d 1364, 1377 (Fed. Cir. 2008), and there can be no infringement, as a matter of law, "[i]f a theory of equivalence would vitiate a claim limitation." PC Connector Solutions LLC v. SmartDisk Corp., 406 F.3d 1359, 1365 (Fed. Cir. 2005) (internal citation and quotation marks omitted).

InnerWorkings argues that e-LYNXX's DOE theory is barred by prosecution

---

[2] e-LYNXX does not assert a doctrine of equivalents theory as to the '143 patent claims.

history estoppel, and even if that were not so, e-LYNXX's theory does not comply with the All-Elements Rule. Prosecution history estoppel requires a court to interpret a patent's claims "in light of the proceedings in the PTO during the application process." <u>Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.</u>, 535 U.S. 722, 733 (2002). Estoppel prevents a patent holder from reclaiming under the doctrine of equivalents what he surrendered during patent prosecution. <u>Id.</u> at 733-34 (stating that when a patentee narrows a claim during prosecution "in response to a rejection, he may not argue that the surrendered territory comprised unforeseen subject matter that should be deemed equivalent to the literal claims of the issue patent"); <u>see also</u> <u>Duramed Pharm., Inc. v. Paddock Lab., Inc.</u>, 644 F.3d 1376, 1380 (Fed. Cir. 2011). When a patentee narrows a claim in response to a prior art rejection by the PTO, a presumption of estoppel applies, which may be rebutted upon a showing that the alleged equivalent was "unforeseeable at the time of the amendment and thus beyond a fair interpretation of what was surrendered." <u>Id.</u> (internal quotation marks and citation omitted).

The prosecution history indicates that the patentee surrendered its claim to a system that is not accessed directly by a buyer. On October 3, 2006, in response to an office action of May 18, 2006, the patentee for the '106 patent filed an amendment to independent claim 1, which would become claim 13 of the issued patent. The patentee amended the claim so that the step for receiving an electronic communication identifying the vendors for the vendor pool originated from "each buyer using the system." (<u>See</u> Ex. A, Doc. 283-1 at 27). In the same amendment,

the patentee altered the job-data-receiving-step to originate "from or on behalf of at least one buyer." (Id.) These amendments were made in order to overcome prior art rejections by the patent examiner. (See id. at 29).

The doctrine of equivalents is meant to account for the imprecision of language to describe the "essence" of an invention, but when it is clear that the inventor "knew the words for both the broader and narrower claim, and affirmatively chose the latter," the patentee is estopped from claiming the former in litigation. Festo, 535 U.S. at 734-355. Such is the case here. The October 3 amendment makes manifest that the patentee understood the difference between a system accessed directly by the buyer, and one accessed by or on behalf of the buyer. Attempting to overcome a prior art rejection, the patentee abandoned the broader claim that e-LYNXX now asserts, instead requiring that "the buyer using the system" identify vendors for the vendor pool. InnerWorkings' PPM4 system is not accessible by buyers, as the court has construed that term, and e-LYNXX relinquished the broader claim that would encompass the PPM4 system. Summary judgment for InnerWorkings is therefore appropriate as to infringement of the '106 patent.

b.      *"a pool of vendors associated with said buyer"*

InnerWorkings asserts, in addition to its argument related to the term "buyer," that the PPM4 system does not infringe the '143 patent as a matter of law because it does not associate a pool of vendors with a buyer. Claim 1 of the '143 patent describes an electronic communication from or on behalf of a buyer

"identifying a plurality of vendors for inclusion in a pool of vendors associated with the buyer to potentially receive a job solicitation." '143 patent, col. 19, ll. 1-5.  In its claim construction order, the court construed the term "a pool of vendors associated with said buyer" to mean "two or more vendors associated with a buyer that can potentially receive a job solicitation from that buyer."  (Doc. 205 at 54).  In adopting this construction, the court agreed with e-LYNXX that the patent specification "allows buyers to pre-qualify vendors *before* the system runs a job data comparison to select those who are qualified, and ultimately to solicit bids from them."  (Id. at 30).

InnerWorkings argues that the PPM4 system does not associate buyers with vendors or print managers, that the buyer does not control which vendors against whom particular job data will be compared, and that in any bid solicitation, the job data is compared against every vendor in the PPM4 system, not against a subset of vendors.  (See Doc. 237-2 at 14-15).  InnerWorkings' senior business analyst Colleen Cioffi stated at her deposition that the PPM4 system does not allow a buyer to identify a subset of the database:

> Q:   . . . What I'm saying is, can an enterprise customer set it up so that I don't want to get this list out of 7,000, I only want to use 20 to show up as potential recommended suppliers?
>
> A:   No, sir, the system doesn't support that at all.
>
> Q:   Okay. Likewise – or not likewise, but relatedly, can I, as an enterprise customer, exclude particular suppliers?
>
> A:   No, sir.

(Cioffi Dep., Doc. 237-12 at 121:25 - 122:1-9). InnerWorkings' director of technology Mr. Mohammed Basheeruddin testified that "[a] customer is never tied to a supplier" because the "system doesn't have that capability." (Basheeruddin Dep., Doc. 237-13 at 34:11-13). Mr. Basheeruddin further stated that, once an InnerWorkings print procurement manager enters the specs for a job, the PPM4 system will compare those specs "against all suppliers within the system . . . to see if there's a match for . . . those specifications." (Id. at 45:6-14; see also id. at 69:11-14 ("Q: Okay. There is never an occasion in which a subset or less than all is examined? A. No. It will be all the vendors.")).

e-LYNXX does not directly dispute that the system does not extract a subset of vendors from the database, but pivots the focus to the fact that the PPM4 system maintains records for vendors that have not been certified by InnerWorkings or are otherwise pending, inactive, or deleted. (Doc. 266 at 22). According to e-LYNXX, because only certified vendors are selected from the aggregate database, the certified vendors form a vendor pool "associated" with a buyer for receiving a job solicitation. e-LYNXX's expert Ivan Zatkovich opines that the court's construction of vendor pool "pertains to any set of vendors that is qualified by the system to be made available to receive a job solicitation from the buyer." (Zatkovich Decl., Doc. 267-2 at ¶ 51). He further states that he has "identified no constraint in the claim language or the Court's claim constructions that requires that different buyers have access to unique or different pools of vendors." (Id.) However, Zatkovich provides no elaboration – and cites no evidence – to support this supposition. See, e.g.,

27

Intellectual Sci. & Tech., Inc. v. Soney Elecs., Inc., 589 F.3d 1179, 1184 (Fed. Cir. 2009) ("An expert's unsupported conclusion on the ultimate issue of infringement will not alone create a genuine issue of material fact.").

What e-LYNXX describes is not a vendor pool as the court construed the term. The claims discuss a vendor pool *associated* with a buyer, and the court's construction of this term contemplates the system creating a subset of vendors, associated with the buyer, against whom the client's job specifications may then be compared. Culled to its essence, e-LYNXX's argument is that when a print manager runs a search on the PPM4 system, the entire database of vendors becomes "associated" with the buyer. (See Doc. 266 at 22). This is inconsistent with the court's claim constructions. The '143 patent's claims require that a subset of vendors be drawn from a database before running a job specification comparison. There is no genuine factual dispute that InnerWorkings' system does not compare a buyer's job specifications to anything less than the entire network of vendors in its database. Accordingly, the PPM4 system cannot, as a mater of law, infringe the '143 patent, and the court will grant InnerWorkings' motion for summary judgment as to the '143 patent.

iii.     Cirqit's Motion for Summary Judgment

Cirqit posits that each asserted independent claim of the '143 and '106 patents requires the receipt of electronic communications from a plurality of vendors, used to create "vendor records" that reflect "vendor capability data," and requires an automatic comparison of vendor capabilities with job data submitted by

28

the buyer.  Cirqit's Order-It system cannot infringe, they argue, because only

buyers can populate the system with information about vendors, meaning Order-It

does not receive electronic communications *from vendors* as required by the claims.

Second, the system does not store "vendor capability data" as the court has

construed that term, or use that data to evaluate a vendor's fitness for a particular

bid.  Rather, the only information used by the system to determine a vendor's

participation in the bidding process relates to the vendor's business type and goods

sold.

In its claim construction order, the court construed the terms "vendor

records" and "vendor capability data."  Vendor records is the broader term of the

two, which the court interpreted to mean "a set of attributes associated with a

vendor," rejecting defendants' argument that vendor records meant "data input

into the system *by the vendor* which identifies the vendor's capabilities."  (Doc. 205

at 14 (emphasis added)).  The court agreed with defendants that "vendor capability

data" is a subset of vendor records and refers to "two or more capabilities of a

vendor to manufacture or produce a customized good or service and excluding the

vendor's name, contact information, payment preferences, type of business and

goods sold."  (<u>Id.</u> at 14-15).  However, the court was not persuaded that vendor

records had to be input into the system by the vendors themselves, but rather could

be input by an intermediary or third party.

Claim 1 of the '143 patent claims a method for facilitating the buying of

customized goods or services, requiring a step for "receiving and processing

electronic communications from a plurality of vendors." '143 patent, col. 18, ll. 59-61. The electronic communication is used to "establish[] a plurality of vendor records," which includes "vendor capability data identifying a plurality of capabilities for said vendor to provide a customized good or service." Id. col. 18, ll. 65-68. Claims 2 of the '143 patent and 13 of the '106 patent claim systems that "receive and process electronic communications from a plurality of vendors." '106 patent, col. 21, ll. 1-2; '143 patent, col. 20, ll. 3-4.

As a threshold matter, Cirqit argues that summary judgment is appropriate because there is no genuine factual dispute that buyers, not vendors, submit the electronic communications used to establish vendor records, but this simply refashions an argument Cirqit lost at claim construction. In rejecting defendants' proposed construction of "vendor records," the court recognized that the vendor records "need not be input by the vendors themselves, but may be input by an intermediary or third-party," (Doc. 205 at 15), because the specification describes an alternative embodiment in which vendor attributes are entered by the print buyers. See '106 patent, col. 11, ll. 31-34. Cirqit's argument that the Order-It system cannot, as a matter of law, infringe e-LYNXX's patents merely reargues its construction of "vendor records," and is accordingly rejected.

Cirqit argues in the alternative that the Order-It system cannot infringe because it does not store or evaluate suppliers on the basis of vendor capability data. As noted *supra*, the court construed this term to refer to a vendor's capabilities to manufacture or produce a particular good or service, but not

30

including the vendor's name, contact information, payment preferences, type of business or goods sold. Cirqit claims that the Order-It system relies exclusively on the vendor's type of business and what goods they sell in determining their suitability for a particular job.

The Order-It system allows a user to enter information about what a vendor can produce. This information includes whether the vendor sells such products as one and two color manual documentation, product catalogs, envelopes, bound commercial printing with one or two text sections, commercial print catalogs, die cut mailers, letters, cards, pocket folders, posters, stationary and business cards, flat or folded commercial printing, and flat or folded financial printing, among others. (See Enhancement Release Notes for Order-It, Br. in Supp. Ex. B, Doc. 233-3 at 22). Cirqit argues that this information falls under the aegis of the types of goods that the vendor sells, rather than data identifying the vendor's capabilities, an example of which could include the vendor's ability to print four colors in one pass. The court agrees.

e-LYNXX views the distinction in terms of the level of generality – paper goods generally would be the type of goods sold, within which some vendors would have the "capability" to sell envelopes – but this argument is unpersuasive. The Order-It system can readily be distinguished from the vendor capability information contemplated in e-LYNXX's patents by considering one embodiment described in the patent specification. Figure 10 shows a specific embodiment of the invention in which the buyer indicates, by clicking radio buttons in a web browser,

whether the vendor must have a press capable of printing four colors in one pass, whether the vendor's ink must be at least 20% vegetable oil, whether the user requires laser proof ink, and whether the vendor must be able to perform ink matching. <u>See</u> '143 patent, fig. 10. The buyer is able to specify whether a vendor must have these capabilities in order to receive an invitation to bid on a print job. <u>See</u> <u>id.</u> at col. 13, ll. 2-3, 22-26. But the Order-It system does not store this type of information about vendors. Rather, it compares vendors based on the type of goods that they sell – envelopes, letters, cards, posters, and so forth. (<u>See</u> Garno Decl., Br. in Supp. Ex. B, Doc. 233-2 at ¶ 2). Therefore, the patent claims do not read literally on Cirqit's product, and summary judgment is appropriate.[3]

**V.**    <u>**Conclusion**</u>

For the reasons previously discussed, the court will deny e-LYNXX's motion to strike and defendants' motion for leave to file an amended complaint, and will grant the motions for summary judgment of Cirqit and of InnerWorkings. An appropriate order will issue.

                                  <u>S/ Christopher C. Conner</u>
                                  CHRISTOPHER C. CONNER
                                  United States District Judge

Dated: July 25, 2013

---

[3] Though it raises a doctrine of equivalents argument in its brief, e-LYNXX advances that argument in response only to Cirqit's point on who enters the vendor records into the system. e-LYNXX does not make that argument with respect to the vendor capability argument.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| e-LYNXX CORPORATION, | : | CIVIL ACTION NO. 1:10-CV-2535 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Conner) |
| v. | : | |
| | : | |
| INNERWORKINGS, INC., | : | |
| RENT-A-CENTER, INC., | : | |
| DR. PEPPER SNAPPLE GROUP, | : | |
| INC., R.R. DONNELLEY & SONS | : | |
| CO., NEWLINENOOSH, INC., | : | |
| THE STANDARD REGISTER CO., | : | |
| AND CIRQIT.COM, INC., | : | |
| | : | |
| Defendants | : | |

## ORDER

AND NOW, this 25th day of July, 2013, upon consideration of the motions for summary judgment on the grounds of non-infringement (Docs. 232, 235), filed by defendants Cirqit.com, Inc. ("Cirqit"), and InnerWorkings, Inc. ("InnerWorkings"), respectively, the motion for leave to file an amended answer (Doc. 252), filed jointly by defendants, and plaintiff e-LYNXX Corporation's motion to strike Cirqit's summary judgment evidence (Doc. 259), and for the reasons discussed in the accompanying memorandum, it is hereby ORDERED that:

1.  Defendants' motion for leave to file an amended answer (Doc. 252) is DENIED.

2.  e-LYNXX's motion to strike Cirqit's summary judgment evidence (Doc. 259) is DENIED.

3.  e-LYNXX's request for oral argument (Doc. 299) is DENIED.

4.      InnerWorkings' motion for summary judgment (Doc. 235) is
        GRANTED.

5.      Cirqit's motion for summary judgment (Doc. 232) is GRANTED.

6.      InnerWorkings motion to exclude the testimony of e-LYNXX's
        damages expert Clifford L. Fry, Ph.D. (Doc. 295), pursuant to Federal
        Rule of Evidence 702, is DENIED is moot.

7.      The Clerk of Court is directed to close the case.


                                        S/ Christopher C. Conner
                                        CHRISTOPHER C. CONNER
                                        United States District Judge